## Case No. 17,251.

### The WATCHMAN.

[1 Ware (232), 233.] [1]

District Court, D. Maine. April 19, 1832.

COMPETENCY OF WITNESS—PROOF OF INTEREST—ASSIGNMENT BY INSOLVENT — EFFECT IN ANOTHER STATE—FRAUD AS TO CREDITORS.

1. When a witness is objected to on the ground of interest, the party which makes the objection, may support it either by examining the witness himself on the voir dire, or by other independent evidence; but he cannot employ both these methods. If he chooses the former, the objection may be removed by the testimony of the witness himself. But if the interest of the witness is proved by evidence aliunde, this proof must be overcome by proof independent of the testimony of the witness.

2. By the law of Maine, a general assignment by an insolvent debtor, who has his domicil in another jurisdiction, of all his property to trustees for the benefit of his creditors, will not protect his property, found in that state, from the attachment of a creditor resident there. But this rule applies only to property which is found within the jurisdiction of the state at the time of the assignment, and does not extend to property which is casually brought within the state after it has become vested in the assignees.

[Cited in Towne v. Smith, Case No. 14,-115; Perry Manuf'g Co. v. Brown, Id. 11.015; Betton v. Valentine, Id. 1,370.]

[Cited in Felch v. Bugbee, 48 Me. 19.]

3. An assignment by an insolvent debtor of all his property to trustees, in trust for the benefit of such of his creditors as should become parties to the assignment and release their debts, and after paying such creditors, in further trust, to pay over the surplus to himself, is void as against dissenting creditors; the legal operation of such an assignment being to delay and defraud creditors.

[Cited in Howell v. Edgar, 3 Scam. 420.]

[4. Cited in Thurber v. The Fannie, Case No. 14,014, to the point that admiralty has jurisdiction of petitory as well as possessory actions, and has often been called upon to adjudicate upon the title to ships.]

The material facts in this case are, that on the 15th of July, 1829, Tobias Lord was owner of one third part of the brig Watchman, and being then in insolvent circumstances, made an assignment of all his property, including his share in this brig, to Francis Watts and S. C. Pray, in trust, to sell and dispose of the same, and to pay such of his creditors as should become parties to the deed in the third part, in the order in which they are named in a schedule annexed to the assignment, and after paying them, to pay over the surplus to him, the assignor. There is a condition in the assignment, that all creditors who become parties to it thereby released the assignor from all further claim of their demand. There are also covenants, on the part of Lord, to make further assurances to the assignees. In pursuance of these covenants, on the 3d of August following, Lord conveyed his third part of the Watchman by a regular bill of sale. The vessel was registered in Boston,

[1] [Reported by Hon. Ashur Ware, District Judge.]

the place of residence of the assignor, and was at sea at the time of the assignment, and also at the time of the execution of the bill of sale. She arrived at Kennebunk port, in Maine, on the 7th of August, and on the same day was attached at the suit of D. W. Lord, as the property of Tobias Lord. The agent of the assignees went on board and demanded possession of her on the 8th. Some time after this, on the petition of the part owners of the two thirds, she was delivered to them by a decree of this court, on their filing a bond for her safe return, and sent on a foreign voyage. The assignees joined the other owners in the voyage, paying their share of the outfits, and taking their share of the return profit. D. W. Lord prosecuted his suit against Tobias Lord to judgment, and the Watchman, having returned to Kennebunk, was seized on his execution by the deputy marshal. and sold, and delivered 13th November, 1831, to William Lord. Before this time, that is, on the 14th October, 1830, the assignees sold the third which had been assigned to them, to G. & I. Lord, the libellants. This libel was brought to recover the possession of the vessel, and to have the sale by the deputy marshal, on D. W. Lord's execution, declared void.

The claimant put in a plea to the jurisdiction, which was argued and overruled by the court at a former day of the term, and it came on to be argued upon its merits. It was learnedly and elaborately argued by F. O. W. Watts and Mr. Greenleaf, for the libellants, and Mr. Shepley, for the respondents.

The counsel for the libellants quoted Richards v. Dutch, 8 Mass. 506; Portland Bank v. Stacey, 4 Mass. 661; Wheeler v. Sumner [Case No. 17,501]; D'Wolf v. Harris [Id. 4.-221]; Badlam v. Tucker, 1 Pick. 396; 2 Brown, Civ. Law, 132; Ingraham v. Wheeler, 6 Conn. 277; Abb. Shipp. 12, note; 2 Kent, Comm. 394; 3 Kent, Comm. 96, 364; Atkinson v. Maling, 2 Term R. 462; Halsey v. Fairbanks [Case No. 5,964]; Joy v. Sears, 9 Pick. 4; Howland v. Harris [Case No. 6,-794]; Marbury v. Brooks, 11 Wheat. [24 U. S.] 99, note a; Holmes v. Remsen, 4 Johns. Ch. 460; 20 Johns. 229; Pearpoint v. Graham, [Case No. 10.877]; Andrews v. Ludlow, 5 Pick. 28; Emerson v. Knower, 8 Pick. 63; Fox v. Adams, 5 Greenl. 245; Canal Bank v. Cox, 6 Greenl. 395; 2 Paige, 419.

The counsel for the respondents quoted Goodwin v. Jones, 3 Mass. 517; Boston v. Boylston, 4 Mass. 324; Richards v. Dutch, 8 Mass. 515; Dawes v. Boylston, 9 Mass. 350; Stevens v. Gaylord, 11 Mass. 269; Dawes v. Head. 3 Pick. 128; Harrison v. Sterry, 5 Cranch [9 U. S.] 289; Meeker v. Wilson [Case No. 9,392]; Ingraham v. Geyer, 13 Mass. 146; Fox v. Adams, 5 Greenl. 245; Widgery v. Haskell, 5 Mass. 144; Harris v. Sumner, 2 Pick. 129; Seaving v. Brinkerhoff, 5 Johns. Ch. 329; Hyslop v. Clarke, 14

Johns. 459; Austin v. Bell, 20 Johns. 442; Burd v. Smith, 4 Dall. [4 U. S.] 76; Halsey v. Fairbanks [Case No. 5,964]; Borden v. Sumner, 4 Pick. 267; Monte Allegre, 9 Wheat. [22 U. S.] 616.

WARE, District Judge. The libellants derive their title from the assignment of Tobias Lord. If that assignment, and the bill of sale of the 3d of August, gave a good and indefeasible title to Watts and Pray, the assignees, they made one equally good to the libellants, and they must be considered as the legal and rightful owners of the share of the vessel that is now in controversy. If this court has jurisdiction over the subject-matter in dispute between the parties, that is, if it has jurisdiction to decide which is the rightful owner, it is not denied that the court may order the possession to be delivered to the party which has the right of property. And this depends entirely on the effect and validity of the assignment of T. Lord.

There were several preliminary questions raised and discussed at the argument which must be disposed of before we can arrive at the merits of the case. In the first place, it is contended that the execution of the assignment is not proved by competent evidence.

The deposition of R. C. Waterston and George Callender, two of the attesting witnesses, were offered to prove the deed. The deposition of Callender is objected to on the ground of interest, as proved by the deed itself, he having signed it as a creditor of the third part. In his deposition, he states that he has released his interest; and further, that though he became a party to the deed under the belief at the time that he was a creditor, on an examination of his account he ascertained that there was then nothing due to him from Lord. He had, therefore, no interest. The general rule is, that when a witness is objected to on the ground of interest, the party who makes the objection may sustain it either by examining the witness himself on the voir dire, or by other independent evidence. He cannot adopt both methods, but is confined to one. If he chooses the former, the objection may be answered by the testimony of the witness himself. But if the party making the objection prove the interest by evidence aliunde, this proof must be overcome by evidence independent of the testimony of the witness himself. For his interest having been proved by evidence independent of his own examination, until this proof is overcome by counter-proof, he cannot be examined at all. Murray v. Marsh. Phil. Ev. 101, 102, 2 Hayw. [N. C.] 290; Mifflin v. Bingham, Peak, Ev. 186; [Mifflin v. Bingham] 1 Dall. [1 U. S.] 272; Bridge v. Wellington, 1 Mass. 219.

As the proof of interest arises from the deed, I am inclined to think, notwithstand-

ing he testifies that he never had, in point of fact, any interest in the deed, that the release ought to be produced. But if the deposition of Callender be rejected, I think the deed is sufficiently proved by Waterston. He witnessed the execution of it by the parties of the first and second part, and of part of those of the third part, and this, without proving the execution by all the creditors, is sufficient to bring the deed into the case.

A question was also made, whether, on the whole evidence, it is satisfactorily proved that the bill of sale, by T. Lord to Watts & Pray, was executed as early as the 3d of August. The testimony appears to me to leave no reasonable doubt of that fact.

It is further argued, that there was no consideration for the bill of sale. This was made in pursuance of the covenant for further assurances in the assignment, and to carry that into full effect. If there is a good consideration for the assignment, there is, therefore, a sufficient consideration for the bill of sale.

Having disposed of these preliminary questions, we come to the case on its merits. Two questions have been raised, and learnedly argued at the bar. The first relates to the effect and operation of the assignment, supposing it to be good and valid in law. The second calls in question its validity, on the alleged ground that it is fraudulent as against creditors.

On the first point, it is contended that the assignor being a citizen of Massachusetts, and the assignment being for the benefit of creditors, the law of Maine will not allow to the assignment such an effect as would withdraw the property of the debtor from the attachment of a creditor residing there. The principle, as I understand it, is, that the assignment of an insolvent debtor, having his domicil in a foreign jurisdiction, is valid to transfer his property lying in Maine;—that the property vests in the assignees, liable, however, to be divested by the attachment of a creditor who has his domicil in Maine. In support of this principle, the counsel for the respondents relies on the decisions of courts in this country, in relation to foreign administrators, in regard to the operation of foreign bankrupt laws, and also on decisions on the effect of assignments of insolvent debtors having their domicil in a foreign jurisdiction.

It is a well settled principle of law, that an administrator cannot, by virtue of an authority derived from a foreign jurisdiction, intermeddle with the property of the deceased person, on whose estate he administers, situated in another state. To do this, he must be clothed with authority, by the laws of the state within which he proposes to act. His right to represent the deceased, which he derives from the law, is conceded only where the authority of the law, from which he derives his right, is admitted. It is then said that the property being reduced

into his possession by virtue of an authority derived from the local law, the same law will retain enough of the fund to satisfy all creditors living within that jurisdiction, and transmit the surplus only to be distributed under the law of the deceased's domicil. Though some of the cases support the doctrine to this extent, it cannot be said, when stated in these general terms, to be a settled principle of American jurisprudence. The subject was learnedly and ably discussed by the court in the case of Dawes v. Head, 3 Pick. 128, and a strong disposition was shown to introduce an important qualification into the rule.

It is also a principle which may be considered as thoroughly incorporated into the jurisprudence of this country, that a foreign bankrupt law cannot operate a transfer 'to his assignees, of the property of a bankrupt situated in this country. Harrison v. Sterry, 5 Cranch [9 U. S.] 289; 2 Kent, Comm. 380. The opposite doctrine has been supported by the high authority of Chancellor Kent (4 Johns. Ch. 460). But the decision in that case stands alone. 9 Pick. 315. All the other authorities are the other way. The doctrine is stated in the form of a maxim, by Chief Justice Marshall in Harrison v. Sterry, and it seems to me to stand on a broad principle of universal law, too well established, in the jurisprudence of all nations, to be called in question. It rests on the general principle of the independence of nations. No principle can be more incontrovertible than this, that every nation has the exclusive legislative and judicial authority within its own territorial limits. A state which admits that the laws or the judgments of the judicial tribunals of any other power can control its own laws, and the judgments of its own courts, within its own jurisdiction, makes, to that extent, a surrender of its independence. It is on this principle that the judgments of courts have no authority beyond their own jurisdiction (10 Toull. Droit Civile Francais, No. 76–93), and that administrators cannot represent the deceased beyond the jurisdiction from which they derive their authority. If in some instances the assignees of a foreign bankrupt have been permitted to represent the bankrupt, this has been an indulgence, and has never been permitted to the prejudice of the citizen of the jurisdiction, by which it has been allowed. The practice of sending home 'the effects of a deceased person to be distributed under the law of his domicil, is not in derogation of this principle. This is a rule of the jus gentium, adopted by the municipal law of all countries. But it is equally well settled that real property descends according to the law of the place where it is situated, and not by the law of the deceased person's domicil. 2 Kent, Comm. 344.

The case, however, of a voluntary assignment by an insolvent debtor domiciled in another jurisdiction, involves different principles from those which govern foreign administrations, judgments, and bankruptcies. In the latter cases, it is the law which operates the transfer, in the former it is the will of the party. If it be admitted as a universal principle of the jus gentium that the public power of every nation is confined within its own territorial limits, and expires when it passes them, it is a principle equally well established that the owner has the disposing power over his own property, wherever it is situated. A contract clothed with the solemnities required by the law of the place where it is made, is valid everywhere, provided it is not repugnant to the principle of the independence of nations, and does not derive its efficacy from the public power. 2 Kent, Comm. 364; 10 Toull. Droit Civile Francais, No. 79, note. Without the acknowledgment of this principle, commerce could not be carried on between individuals of different nations; it is admitted, therefore, in the jurisprudence of all civilized communities. But where a contract is sought to be enforced in a different jurisdiction from that where it is made, and the law superadds a virtue to the contract beyond what is expressed by the act of the party, it will withhold a remedy for that part of the obligation which flows from the public power, while it will enforce that which proceeds from the will of the party. This distinction may be illustrated by an example from the law of France. A contract made before a notary, and clothed with certain solemnities, gives to the creditor an hypothecary interest in the property of the party bound, but if entered into with these formalities in a foreign country and before a foreign notary, it will create no lien on the property of the debtor, because the hypothecation flows, not directly from the act of the party, but from the concurrence of the public power or public will with the private will of the debtor. 10 Toull. No. 74. The law separates that which is derived from the public power from that which comes from the will of the party. It preserves the one and annuls the other, holding the party to be personally bound by his contract, but his property free from the lien. Tried by this principle, if the assignment of the debtor in the present case is valid in Massachusetts, it is valid everywhere, and operated a transfer of his property wherever situated. For the transfer was made by the simple will of the owner, and not by virtue of the public power, as in the case of a bankruptcy.

But the counsel for the respondent contends that the principle is received with this qualification, that the assignment shall not be supported to the prejudice of creditors who have their domicil in the state where the property is found. This qualification is supported, and may be considered as incorporated into the jurisprudence of Maine by the decision in the case of Fox v. Adams, 5 Greenl. 245. The judgment of the court in that case is placed on this precise ground, so clearly and distinctly that it must be considered as settling the local law. In reply, it is argued that this rule of

defensive or protective jurisprudence is strictly local, and though adopted by the local courts, is not binding on the courts of the Union; that these courts may rightfully, in commercial questions, where it is so important that the law should be uniform, consider all citizens of the United States as living under one jurisdiction. Whatever weight this argument might otherwise have, it seems to be answered in this case by the decision of the court of Massachusetts, in Ingraham v. Geyer, 13 Mass. 146, by which the same principle is established as the law of that state.

Another objection is, that the facts do not bring this case within the principle established by the decisions which have been relied upon. The assignment was made on the 15th of July, and the further assurance by the bill of sale, on the 3d of August. By these acts the property became vested in the assignees, liable only to be devested by the attachment of a creditor on the neglect of the assignees to take possession within a reasonable time after the arrival of the vessel in this country, she being at that time at sea. She arrived at Kennebunk on the 7th of August, and the agent of the assignees took possession on the 8th. It has not been pretended that there was any unreasonable delay here imputable to the assignees. The property became, therefore, vested in them before it arrived in this state. In the cases of Ingraham v. Geyer, and Fox v. Adams, the property attached was within the jurisdiction at the time of the assignment. To hold that property which is already vested in the assignees, may, when it casually comes within another jurisdiction, be devested by the attachment of a dissenting creditor, would be extending the operation of this principle further than it has yet been carried. For it is to be borne in mind that Boston was the home port of the brig where she was registered, so that her coming into Kennebunk must be considered as merely casual in the course of her business, and not a return to her home. It does not appear to me that this rule of local law, admitting it to be well established, applies to such a case. As these decisions constitute not so properly a rule of law as an exception to a rule, he that would avail himself of the benefit of the exception must bring his case strictly within its terms, or the court must enlarge the exception to take in his case. To extend the principle of these decisions, so as to cover the facts in the present case, would lead to much embarrassment which would not be compensated by any equivalent advantage. It is allowing the domestic creditor's priority a sufficient scope to enable him to defeat the transfer as to all property found within the jurisdiction at the time when the assignment is made. If the assignment of T. Lord and the bill of sale afterwards made were good and valid, to transfer the title of this vessel against a creditor, not a party to the assignment, residing in Massachusetts, I think they ought to be held valid to protect the vessel against the attachment of a dissenting creditor residing in this state.

This brings us to the second point made in the argument; whether the assignment is wholly void as against creditors who do not assent to it, but choose to pursue their separate remedies for their separate rights. I should have been well satisfied to have avoided giving an opinion on a question, upon which the most enlightened tribunals of the country have apparently arrived at opposite conclusions, and on which the most learned judges have hesitated and paused in a painful suspense and conflict of doubt. But the question has been learnedly argued at the bar, and, in the view that I have taken of the case, it necessarily presents itself for decision. I feel it as a most sensible relief, that my judgment will be reviewed by the appellate tribunal.

By this assignment, Tobias Lord transfers all his property to his assignees in trust, first, to pay such of his creditors as should become parties to the assignment in the order in which they are classed in a schedule annexed to the deed; —secondly, after paying these creditors, to pay the surplus to himself. The creditors who became parties to the assignment agree, in consideration of the provision made for them in the assignment, to release Lord from their respective debts. The release is incorporated into the deed, so that the creditors are not permitted to take any benefit from the assignment without discharging their debtor, whatever may be the grade they hold in the preferences.

The counsel for the libellant contends that the current of authorities sustains the validity of such an assignment, and particularly that it is valid in the state of Massachusetts, where it was made. In the case of Halsey v. Fairbanks [Case No. 5,964], the circuit court, after a learned and elaborate review of the authorities, came, with some hesitation, to this conclusion. The learned judge who pronounced the opinion said, that "he yielded to what seemed to be the tone of the authorities." But in that case, the court puts its decision wholly on the ground that such is the local law of Massachusetts, and intimates too clearly to admit of doubt, that if the local law were not apparently settled, but the question was entirely open, the general principles of law would have led to a different result. The case of Borden v. Sumner, 4 Pick. 265, was argued before the supreme court of the state, in the same month when Halsey v. Fairbanks [supra] was decided. The assignment contained a similar condition. The court sustained the plaintiff's action on a different ground; but this question was argued by the counsel, and the court, in giving their opinion, say, "that they think this point has never been decided in that state, and that they reserve themselves on that important question until it shall be directly presented." This decision, having been made after that of Halsey v. Fairbanks was known to the profession, merits the most deliberate attention. The circuit court had inferred this principle not so much from the authoritative decisions of the courts as from the silent acquiescence of the public; not that it has been clearly settled

or distinctly recognized by the judicial tribunals, but that it had slowly ripened into a rule of the common law of the state by usage and custom. When the supreme court of the state, with this decision before them, go out of their way to express themselves in these monitory terms on a question which it was not necessary to decide, it cannot be considered as any thing less than a caution to the profession and to the public not to trust too implicitly to a practice, which to whatever extent it may have insinuated itself into the usages of the community, was yet to be subjected to the severe and rigorous scrutiny of law.

But it may be doubted whether this question is to be governed solely by the law of the place where the contract is made. The assignment is assailed on the ground of fraud, and what is fraud in one place is fraud in another. The rules of fair and honest dealing are not local but of universal obligation and binding everywhere. Cases between parties living under different jurisdictions, where there is an allegation of fraud, it would seem, ought to be governed not by any local rules of law, but by those general rules which find a place in every system of just and equitable jurisprudence. That national comity, which holds a contract, which is valid under the law of the place where it is made, valid everywhere, cannot justly be extended to protect a contract questioned on the ground of fraud.

But looking to the general and not the local law, we do not find this question settled by any general and uniform course of decisions. By the law, as it is expounded by the courts of New York, it seems very clear that such a condition will render the assignment void (Hyslop v. Clarke, 14 Johns. 459; Austin v. Bell. 20 Johns. 442; Seaving v. Brinkerhoff, 5 Johns. Ch. 329), while the reverse has been held in Pennsylvania (Lippincott v. Barker, 2 Bin. 174; Pearpoint v. Graham [Case No. 10,877]). In this state, though the case of Canal Bank v. Cox, 6 Greenl. 395, looks very strongly like supporting the validity of such a condition, it is, as I understand, still considered as an open question. The case of Beach v. Viles. 2 Pet. [27 U. S.] 675, before the supreme court of the United States, was a case of an assignment impeached on the ground of fraud, and one of the grounds on which it was impeached was that it contained this clause of release. The decision went on a different ground, and the court avoided this question as one of doubt and difficulty.

If the authorities leave the question in suspense, the elements of a decision must be drawn from the general and acknowledged principles of law, as applied to the provisions of the instrument. A conveyance made for the purpose of hindering, delaying, or defrauding creditors in the recovery of their debts, is universally held to be void at common law. The statutes of 13 and 27 Elizabeth, are considered to be merely declaratory, or in affirmance of the preëxisting law. 2 Kent. Comm. 505. It is an attempt on the part of the debtor

to avoid the performance of his contracts according to their terms. An attempt to lock up his property from his creditors, so that they can never reach it to enforce payment but on such terms as he chooses to prescribe, would be so manifest an effort to defraud them, that two opinions could not be entertained on the subject. A conveyance of his property to trustees, which would keep it under cover and withdrawn from the reach of his creditors for a definite period, as for three, or five, or ten years, unless they would accede to such terms in favor of himself as he should dictate, would constitute another clear case, on which the mind could not hesitate. By following the same course of reasoning it seems just as clear that a transfer by the debtor of his property, which in its effect would delay the creditors' remedy against his estate for an indefinite period, unless they would consent to accept a less sum that their whole debt in satisfaction, or consent to discharge the debtor on different terms from those borne in their contracts, is a conveyance made to delay or defraud creditors. The object of such a conveyance is to coerce the creditor to discharge the debtor from his contract. without his fulfilling its obligations.

It may be said that every conveyance in trust for creditors interposes a delay, and necessarily retards them in the prosecution of their remedies. This may be admitted to be strictly true. But when a debtor abandons his whole property unconditionally to his creditors, and directs it to be equally and fairly distributed as far as it will go to extinguish his obligations. If a temporary check is interposed to the creditors' remedies, it is only for the purpose of doing equal and impartial justice to all, as far as his means will enable him. If any creditor complains, the ground of his complaint must be that he is deprived of the opportunity of securing his whole debt at the expense of other creditors equally meritorious. He is prevented from making use of an advantage against other creditors, not from enforcing his rights against the debtor himself. The law also allows the debtor a further power. It authorizes him to prefer one creditor to another, though equally meritorious. The creditor who is postponed cannot avoid the conveyance. because he may take what the favored creditors leave for him, and still pursue his remedy for what remains, against the debtor. Whatever judgment may be pronounced in the forum of conscience on these preferences between creditors of equal merit. and entitled. on the common principles of equity to equal favor, they are protected and held valid in the forum of law. The debtor may prefer one creditor to another without assigning any other reason than his own pleasure, and his preference will be sustained; but he cannot prefer himself to a creditor. nor can he compel a creditor to receive in satisfaction for his debt any thing short of the full amount due. Any act of a debtor, of which this would be the effect, if the act were carried into execution according to its intent, is unlawful.

Let us then try the present assignment by these principles. Tobias Lord transferred his whole property to Watts and Pray, in trust, for the purpose, first, of paying such creditors as should become parties to the deed in the order of preference established by the assignment. Thus far it is admitted that he had a right to go. He had a right to lock up his property against any one creditor, for the benefit of all, and he had a right to determine the order in which his creditors should be paid out of the trust fund. 2. After paying these creditors, a further trust is created to pay over the residue, not to his other creditors who decline assenting to the conditions of the conveyance, but to himself. In this assignment, therefore, he prefers himself to a dissenting creditor. It is true that the creditor may pursue this property in the debtor's hands when it returns there, but in the mean time his remedy has been delayed. He had always a right to this surplus, but it has been kept from him, and he has been delayed until all the trusts in the deed have been executed. To maintain the validity of such an assignment, we must maintain the proposition that a debtor may, by a conveyance in trust for creditors, keep from the reach of a dissenting creditor property of an indefinite amount, for an indefinite period of time, under a reservation in his own favor. Nor is this all, the creditor is not permitted to take any thing under the assignment, nor the chance of any thing, unless, for the consideration of this possibility, he discharges his whole debt. Such a conveyance, with such a condition, appears to me to be a manifest attempt to coerce the creditors to discharge the obligation on other terms than those expressed in the contract. Such appears to me to be the purpose and intention of the conveyance, and no argument is required to prove such an intent illegal.

It is proper to remark that the respondent has not attempted to impeach this assignment by evidence dehors the instrument. He relies on the evidence to be found in its own terms; and when the validity of an instrument is questioned on the ground of fraud apparent on its face, the question whether it is fraudulent or not must be determined by a fair interpretation of its own provisions. It is a question of pure legal construction. We must collect from its terms what is to be its operation, and what is its intent. Is it lawful to be carried into complete execution, according to the intent of the assignor, as that intent is discovered from a just interpretation of the terms of the assignment? This is the true test. If thus carried into execution, it would hinder, delay, or defraud the creditors—this is considered as the legal intent of the assignor. This is unlawful, and the act is therefore void, for it is this legal intent to which the law looks. It is no answer of this objection of a fraudulent intent that the law will not permit the debtor to carry his whole plan completely into effect; that the creditor may have another remedy, for which he is not indebted to the debtor but to the law. The law operates on the intent, and where the illegality of the intent is apparent on the face of the instrument, it declares the act void.

This is the doctrine of that part of the opinion of the court in the case of Halsey v. Fairbanks, in which the question is examined upon the general principles of law, independent of the local usage of Massachusetts. "I am aware that it may be said," and I am now repeating the words of the learned judge who pronounced the opinion, "that the property may be reached by a trustee process, so that it cannot be absolutely locked up from his creditors. But the question can never be whether a remedy exists for the creditor, but whether the debtor has not endeavored fraudulently to delay or defeat them." In another part of the opinion, the court returns upon this doctrine, and announces it in the most distinct and forcible terms: "The question is not, I repeat it, and cannot be, whether there may not be some remedy for the creditors to intercept the surplus, but whether the intent, apparent on the deed itself, be not to coerce them to a settlement by embarrassing or delaying their remedy. Such an intent is of itself illegal." After the most careful examination that I have been able to give to the subject, it appears to me that the doctrine of that case rests on a firm and solid foundation, and that the arguments of the court are conclusive.

If this assignment, on a fair construction of its terms, is a conveyance made to delay or defraud the creditors, then only a defeasible title was gained by the assignees, liable to be vacated on a seizure by legal process by a dissenting creditor. Whatever, therefore, was the title which they acquired in this vessel, it was not one which protected the property from the attachment of D. W. Lord; and the assignees could give no better title than they received. It continued the property of Tobias Lord, to answer the demands of creditors not parties to the assignment, and the sale on the execution conveyed a good title to the claimant. The libel is therefore dismissed with costs.

NOTE. This case was carried by appeal to the circuit court, but was settled by the parties before it came to a hearing. The right of the admiralty to entertain jurisdiction over possessory actions, that is, when the right of possession is in controversy, has never been questioned. It has always been familiarly exercised by the high court of admiralty in England, and by all the admiralty courts of the United States, and it was said by Sir William Scott, in the case of The Aurora, 3 C. Rob. Adm. 136, that "formerly it was held, for a long time, and down to no very distant period, to be within the jurisdiction of this court to pronounce for the title of ships on questions of ownership." And even since the court of admiralty, to use the very significant language of that eminent judge,

"has been informed by the other courts" that this is a matter which belongs exclusively to them, when the question of ownership arises in a possessory action, and the possession has been gained by force or violence, or by fraud manifest on the face of the transaction, the court does not hesitate to pronounce on the title; but where a course of transactions involving fraud is objected to. the court declines entering on the question. And if it proceed at all originally on a question of title, it considers itself as bound to move within very narrow limits. The Pitt. 1 Hagg. Adm. 240. It is evident, from the language of Lord Stowell, that in declining jurisdiction over the question of title, so far as he has declined it. he has bowed to the authority of the common law courts, and not to their reasons. In the case of The Tilton [Case No. 14,054], the jurisdiction of the court over petitory actions, in which the right of property is in controversy. as well as over possessory actions, is vindicated by reasoning which appears to be entirely satisfactory. Indeed it is difficult to see upon what just distinction it can be upheld in one case and denied in the other. The question of title will often arise in a suit for the possession, and when it does, why should not the court decide it; why should the title be litigated in one court, and the possession in another? The admiralty courts of the United States have not considered themselves as precluded from pronouncing upon the question of ownership. The Tilton [supra].

But though the admiralty has jurisdiction to pronounce on the question of title, grave doubts have been entertained whether it is bound or ought to take jurisdiction, when the question of title is involved and complicated with other matters that are not properly within the jurisdiction of the court. It appears that in England the court holds itself competent, and will decide a question of ownership in some cases, but declines to take jurisdiction where the title is involved in complicated transactions. It seems therefore to be a question to the discretion of the court whether it will pronounce upon the question of title in a given case; that it has the authority and will exercise it when the question is presented in a proper case, but that it cannot be charged with a denial of justice if it declines to take cognizance of a case which it deems more fit to be litigated in another forum, and leaves the party to his remedy in the other courts. The courts of admiralty in this country do not confine themselves within so narrow limits as those to which the court of admiralty in England is restricted by the common law courts, in entertaining jurisdiction over questions of ownership. But still it is thought that when a question of title to a vessel is connected with other questions not of a maritime nature, and not properly cognizable in the admiralty, that the court ought to decline the jurisdiction and leave the party to his remedy in the other courts.